*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0341p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee,*

              *v.*                                                          No. 13-5311

CARLOS JOHNSON,
                              *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:12-cr-20140-3—John Thomas Fowlkes, Jr., District Judge.

Argued: November 21, 2013

Decided and Filed:  December 11, 2013

Before:  SUTTON and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Edwin A. Perry, FEDERAL PUBLIC DEFENDER'S OFFICE, Memphis,
Tennessee, for Appellant.  Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE,
Memphis, Tennessee, for Appellee. **ON BRIEF:** Edwin A. Perry, FEDERAL PUBLIC
DEFENDER'S OFFICE, Memphis, Tennessee, for Appellant.  Kevin G. Ritz, UNITED
STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  Police found a lot of marijuana in Carlos Johnson's
home, after which he pleaded guilty to conspiring to distribute marijuana.  The district
court sentenced him to 97 months in prison.  Johnson now challenges the sentence,

_____

[*]The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of
Illinois, sitting by designation.

1

targeting a two-level enhancement for maintaining a premises—his home—for the purpose of manufacturing or distributing drugs. The amount of marijuana stored in his home (1200 pounds) and the length of time he kept it there (eight months) gave the district court ample reason to apply the enhancement.

I.

Johnson stored marijuana in his Arkansas home in order to distribute the drug in Tennessee through a conspiracy headed by Christopher Boyland, Cedric Words and Antwain Hall. As part of their operation, Boyland, Words and Hall obtained large quantities of marijuana from a Texas supplier, who delivered the marijuana from Texas to Johnson's home in Blytheville, Arkansas. Johnson stored the marijuana in his home until another co-conspirator picked it up to distribute it to mid- and low-level drug dealers in Tennessee.

In the course of their investigation, the police observed three incidents of drug trafficking at Johnson's home. In the first incident, on March 30, 2011, Boyland, Hall and other co-conspirators traveled from Tennessee to Johnson's home on Pittman Road in Blytheville. The conspirators took several plastic bins into the residence and out again. The police later learned that the conspirators had used the bins to transport 300 pounds of marijuana from storage in Johnson's home to dealers in Tennessee. In the second incident, on May 23, 2011, Boyland and other co-conspirators again traveled from Memphis to Blytheville, where one of the co-conspirators entered Johnson's home with a black rolling suitcase. He acquired approximately 60 pounds of marijuana from inside Johnson's home and transported the marijuana back to Tennessee for distribution. In the third incident, on May 29, 2011, police overheard a conversation between Boyland and another co-conspirator about the need to collect more drugs from Johnson's home. Just a few hours later, the co-conspirator visited Johnson's Pittman Road home with a black bag and returned to Tennessee with more drugs.

By December 2011, DEA agents had confirmed that Boyland and his operation maintained their supply of marijuana in Blytheville. Following a group of the conspirators in Blytheville, the agents arrested one of the drivers. He admitted to

delivering four 300-pound loads of marijuana to Johnson at his home in Blytheville. After interviewing the driver, officers stopped Johnson at his new Blytheville home on Lakewood Avenue (he had moved) and received permission to search it. In one of the bedrooms and in a hallway closet, the officers found 237 pounds of marijuana and a handgun. The officers also seized $15,000 in cash, a black scale and three vehicles.

Johnson pleaded guilty to conspiring to sell marijuana. At sentencing, Johnson accepted the facts as stated in his pre-sentence report and all of the proposed guidelines calculations save one: He objected to a two-level enhancement for using his home to distribute drugs. The district court rejected the objection and applied the enhancement, sentencing Johnson to 97 months in prison, the low end of the guidelines range. Johnson appealed, challenging the two-level enhancement.

## II.

The enhancement applies to anyone who "maintain[s] a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). According to the application note, the enhancement applies to any defendant "who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n.17; *see also Stinson v. United States*, 508 U.S. 36, 38 (1993) (treating commentary in the Guidelines Manual as "authoritative").

That helps some. A little history helps some more. The Sentencing Commission added the drug-house enhancement in response to the Fair Sentencing Act of 2010, which directed the Commission to include a two-level enhancement for "maintain[ing] an establishment for the manufacture or distribution of a controlled substance, as generally described in [21 U.S.C. § 856, the "drug house" criminal statute]." Pub. L. No. 111-220, § 6(2), 124 Stat. 2372, 2373 (2010). Before passage of the Act, our circuit and several others had applied the cross-referenced drug-house criminal statute in settings similar to this one. *See United States v. Russell*, 595 F.3d 633, 644–45 (6th Cir. 2010); *see also, e.g.*, *United States v. Verners*, 53 F.3d 291, 295–97 (10th Cir. 1995); *United*

*States v. Roberts*, 913 F.2d 211, 219–21 (5th Cir. 1990).   Because the Commission adopted language nearly identical to the pre-existing drug-house statute to describe the enhancement, *compare* § 2D1.1(b)(12) & cmt. n.17, *with* 21 U.S.C. § 856(a)(1), it is fair to assume that it meant to incorporate prior interpretations of the statute.  *Cf. Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978).

Consistent with the language of the guideline, its application note and the history behind it, the drug-house enhancement applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance.   *See Russell*, 595 F.3d at 644 (applying this test under the pre-existing statute); *see also United States v. Flores-Olague*, 717 F.3d 526, 531–32 (7th Cir. 2013) (applying this test under the guideline); *United States v. Miller*, 698 F.3d 699, 706 (8th Cir. 2012) (same).  Johnson does not quarrel with the district court's findings as to the first two elements.  And with ample cause:  In pleading guilty to possessing 1200 pounds of marijuana, he admitted he knowingly stored marijuana in his home; and he acknowledged that he lived at the two houses where the conspiracy stored the marijuana.  If "the defendant lives in the house, [the maintaining-a-place] element is normally easily proved," *Russell*, 595 F.3d at 645, because a person both "h[olds] a possessory interest in" and "control[s] access to, or activities at" his own home, U.S.S.G. § 2D1.1 cmt. n.17.

But did Johnson maintain his home for the purpose of distributing drugs?  He says no; we say yes.  A defendant may maintain a place for the purpose of distributing drugs even if that is not "the sole purpose for which the premises was maintained." *Id.* A defendant thus may qualify for the drug house enhancement so long as "*one of* [his] primary or principal uses for the premises" is the distribution of drugs.  *Id.* (emphasis added).  A defendant also need not maintain the whole home for distributing drugs to qualify for the enhancement; using a "room" or another "enclosure" for "storage" of the drugs suffices, as the application note indicates.  *Id.* (applying the enhancement to those who "maintain[] a premises (i.e., a building, room, or enclosure) for the purpose" of distributing drugs).

These principles go a long way to answering Johnson's argument. The uncontested facts establish that Johnson maintained at least one room in his home for the purpose of storing marijuana for later distribution. As part of the conspiracy, Johnson received marijuana deliveries from a supplier in Texas and stored 1200 pounds of the drug in his home during an eight-month period. Officers observed three instances in which members of the conspiracy traveled to Johnson's Arkansas home to pick up large quantities of drugs for distribution in Tennessee. *See Miller*, 698 F.3d at 706–07 (finding defendant's active participation "in at least three controlled buys" at her house showed that drug distribution constituted a principal use of the family home). And when law enforcement searched Johnson's home, they found 237 pounds of marijuana in the northeast bedroom, a gun in the bedroom closet, $15,000 in cash and a scale. "[T]he more characteristics of a business that are present" in the home—such as "tools of the trade (e.g., laboratory equipment, scales, guns and ammunition to protect the inventory and profits)," "profits," including large quantities of cash, and "multiple employees or customers"— "the more likely it is that the property is being used 'for the purpose of' [prohibited] drug activities." *Verners*, 53 F.3d at 296–97. Taken together, these facts confirm that Johnson consistently used space in his home for storing large quantities of drugs, the central purpose of which was to further a drug-trafficking conspiracy. *See Flores-Olague*, 717 F.3d at 532–33; *United States v. Sanchez*, 710 F.3d 724, 730 (7th Cir. 2013), *vacated on other grounds*, ___ S. Ct. ___, 2013 WL 2458365 (Oct. 7, 2013). Drug storage thus constituted a "significant or important reason" for which Johnson maintained his home rather than a mere "incidental or collateral use." *Russell*, 595 F.3d at 642–43; U.S.S.G. § 2D1.1 cmt. n.17.

Johnson counters that the drug deliveries occurred infrequently—four times over eight months. Yet the question is not just how often drugs were delivered to the defendant's home; it is also how frequently Johnson used his home to advance the drug-trafficking conspiracy, "including" by "*stor*[*ing*] *a controlled substance* for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n.17 (emphasis added). Although Johnson received just four deliveries of drugs, the quantity of each (roughly 300 pounds) required him to store drugs in his home for a period of time before the conspiracy could distribute

the drugs to lower-level retailers.  And the nature of the drug operation required Johnson to make his home *available* for drug storage continuously, a use that necessarily is as frequent as any other.

At oral argument, Johnson put the point a little differently, claiming he stored drugs for just 5.4 percent of the eight months.  Even if true, it does not follow that this alleged infrequency insulates him from the enhancement.  Other considerations—the significance of the premises to the drug venture, the scope of the drug enterprise, the continuing availability of the house and the location of tools of the trade at the home—continue to support the enhancement here.  *See Sanchez*, 710 F.3d at 731 (applying the drug-house enhancement even though "drugs were not kept [in the family home] for very long and [the defendant] primarily used the home as a residence" because the scope of the drug-related activities was otherwise significant); *Flores-Olague*, 717 F.3d at 533; *Verners*, 53 F.3d at 296–97.

The record at any rate does not support the 5.4 percent figure.  In making this calculation, Johnson assumed that each time the Texas supplier delivered 300 pounds of marijuana to Johnson's home, other members of the conspiracy came a few days later to pick up *the same entire load* and take it to Tennessee.  But the uncontradicted presentence report refutes this assumption.  In one instance, the co-conspirators transported only 60 pounds of marijuana to Tennessee, meaning around 240 pounds of marijuana remained stored in Johnson's home.  In another instance, the co-conspirators left the home with only a single bag, not plausibly enough room to transport 300 pounds of marijuana.

Invoking the Seventh Circuit's decision in *Sanchez*, Johnson adds that the government presented no evidence that he had a high-ranking position in the drug conspiracy or that the stored marijuana had a substantial monetary value.  In that case, the Seventh Circuit concluded that Sanchez's position as "the largest wholesaler in a conspiracy responsible for nearly $2.5 million in drug trafficking" rendered the use of his home in the drug venture "significant."  710 F.3d at 732.  That *Sanchez* found some facts *sufficient* to establish the requisite significance, however, does not mean that those

facts *necessarily* must be shown in every case. Johnson may have played a less prominent role in the conspiracy than Sanchez did, working for the leaders rather than leading himself, but the *use of his home* still played a significant part in the conspiracy. The conspiracy indeed depended on Johnson's home, as it served as the key supply and distribution center where bulk shipments of drugs purchased from a wholesaler were converted to smaller shipments prepared for sale to lower-level retailers in Tennessee. And even if the government did not quantify the value of the marijuana in Johnson's home, it provided another metric for assessing the significance of the drug operation—the quantity of drugs stored. The notion that storing 1200 pounds of marijuana is not "significant" is a hard sell, no matter how low (or high) the street price of the drug.

Johnson adds a cautionary note that, if we apply the drug house enhancement here, it will come up everywhere—every time drugs are found in a home. Not true. As under 21 U.S.C. § 856, where the storage of drugs in the home constitutes merely an "incidental or collateral use[] for the premises"—say when the defendant keeps drugs in his home for casual personal use—the enhancement will not apply. *See Russell*, 595 F.3d at 642–43 ("[T]he 'casual' drug user does not run afoul of [§ 856] because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose.").

III.

For these reasons, we affirm.