NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0144n.06

Case No. 18-1430

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 25, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| NATHANIEL CHRISTOPHER HAGAN, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | **O P I N I O N** |

BEFORE: McKEAGUE, GRIFFIN, and NALBANDIAN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Nathaniel Hagan's drug distribution ring dominated the Lansing, Michigan ecstasy market until law enforcement discovered it in 2016. Hagan eventually pled guilty to conspiring to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(D), and 846. At sentencing, the district court concluded that the so-called "drug-house" enhancement (U.S.S.G. § 2D1.1(b)(12)) and the leadership enhancement (U.S.S.G. § 3B1.1(a)) applied, which increased Hagan's Sentencing Guidelines calculation by six levels. Hagan contends that was clear error. We disagree and, therefore, **AFFIRM**.

## I.

After officers watched Hagan conduct a drug deal in a parking lot, they pulled him over and searched his car. In it, they found 125 hits of LSD. Hagan was arrested and consented to a search of his apartment. At his apartment, officers found a lot of drugs—and supplies to make a

lot more. After all, Hagan was, as he told the police, the largest distributor of MDMA (commonly known as ecstasy) in the area.

Through further investigation, and as Hagan cooperated with law enforcement, officers learned how he achieved that status. Using Bitcoin, Hagan purchased drugs from various overseas suppliers through the "dark web"—intentionally hidden websites inaccessible through traditional search engines that, generally, contain illegal content. Some of the drugs Hagan purchased were delivered in consumable form; others required Hagan to complete the manufacturing process in his apartment. Hagan's apartment was outfitted with all the materials required to do so. He had an LSD conversion laboratory and various drug-manufacturing components such as drying racks, glassware, and a magnetized electric mixer. Hagan told law enforcement how he transferred MDMA and LSD to various forms. And Hagan enticed others to test out his manufactured products by promising free drugs in return.

By the time he was arrested, Hagan had been distributing MDMA, LSD, DMT, mushrooms, and marijuana for approximately one year. He had at least seven customers, some of whom dealt the drugs Hagan sold them to others. At the time of his arrest, officers found in Hagan's apartment 96 grams of DMT in powder form, 88 grams of marijuana, multiple small bags of unknown pills, and 4,467 ready-made hits of LSD as well as materials for another 12,000 hits. Law enforcement also recovered from Hagan's apartment various manufacturing materials, $11,150.00 in cash, two unspecified firearms, shipping documents, and numerous electronics items. Additionally, a search through text messages on Hagan's phone revealed thousands of dollars in cash conversions to Bitcoin, negotiations between Hagan and his customers, and discussions about the manufacturing process for several of the drugs Hagan sold.

Hagan eventually pled guilty to conspiracy to distribute controlled substances. At his sentencing hearing, the district court applied two enhancements that are the subject of this appeal. First, over both parties' objections, the district court applied a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. The district court noted that had it not applied that enhancement, Hagan's sentence would have been the same. Second, the court applied a four-level enhancement under U.S.S.G. § 3B1.1(a) for acting as an organizer or leader of the drug conspiracy. That put Hagan's Guidelines range sentence at 210 to 240 months. The district court granted a government motion for a downward departure, and then varied downward from the Guidelines-recommended range, ultimately sentencing Hagan to 96 months.

Hagan now appeals the district court's application of the two sentencing enhancements.

**II.**

We review a district court's application of a sentencing enhancement to the facts of a case for clear error. *United States v. Simmerman*, 850 F.3d 829, 832 (6th Cir. 2017); *see also Buford v. United States*, 532 U.S. 59 (2001); *United States v. Washington*, 715 F.3d 975, 982–83 (6th Cir. 2013). But even when a district judge clearly errs in applying a sentencing enhancement, we will not remand for resentencing if the error was harmless. *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005). An error is harmless if it "did not cause the defendant to receive a more severe sentence" than he would have received without the enhancement. *United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009) (citation omitted); *United States v. Ward*, 506 F.3d 468, 477 (6th Cir. 2007) ("Sentencing Guidelines range errors that do not affect a defendant's sentence are harmless and do not require a remand for re-sentencing.").

**III.**

**A. Drug-House Enhancement**

The "drug-house" enhancement, U.S.S.G. § 2D1.1(b)(12), applies to anyone who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013) (citation omitted). The "premises" at issue in this case is Hagan's apartment. Hagan does not dispute that he knowingly maintained his apartment, but he contends that he did so for living, and not for manufacturing, distributing, or storing drugs. But a defendant may maintain a place for more than one purpose and still qualify for the drug-house enhancement. *Id.* As long as "*one of* [Hagan's] primary or principal uses for" his home is the manufacture or distribution of drugs, the enhancement applies. *Id.* ("A defendant may maintain a place for the purpose of distributing drugs even if that is not 'the sole purpose for which the premises was maintained.'" (quoting U.S.S.G. § 2D1.1 cmt. n.17)). "At bottom, the question is whether [Hagan's] home 'played a significant part' in distributing [or manufacturing] drugs." *United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014) (quotation omitted). The more the home looks like a business—due to the presence of, say, manufacturing equipment, cash, weapons, and customers or employees—the more likely the answer to that question is yes. *Johnson*, 737 F.3d at 447–48 (citing *United States v. Verners*, 53 F.3d 291, 296–97 (10th Cir. 1995)).

So did Hagan's home play a "significant part" in his drug distribution or manufacturing activities? The district court said it did. And the evidence shows that conclusion was not clear error. Hagan's home carried all the characteristics of a drug business. Hagan's apartment housed a substantial amount of drugs and drug-manufacturing materials, shipping supplies, thousands of dollars in cash, and firearms. He regularly received shipments of illicit drugs at his apartment as

well. Hagan also carried out his drug distribution business from his home for nearly a year. All of this evidence supports the conclusion that Hagan's home played a significant part in his drug enterprise and that applying the drug-house enhancement was not clear error.

Hagan's arguments to the contrary are unavailing. He contends that even though he kept drugs and drug paraphernalia at his home for a period of time, there is no evidence that he actually distributed any drugs from his apartment. But there need not be evidence of distributions from the home itself for the enhancement to apply. The enhancement applies whenever a primary purpose for maintaining a place is for "*manufacturing or* distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12) (emphasis added). It even applies whenever the place is used for "storage of a controlled substance" for later distribution. U.S.S.G. § 2D1.1 cmt. n.1; *see Johnson*, 737 F.3d at 447–48 (finding the drug enhancement applied when the defendant stored a significant amount of drugs and other drug-distribution materials in his home for eight months). Hagan does not dispute that he manufactured drugs at his apartment or that he stored large quantities of to-be-distributed drugs there. Instead, he stresses that the application of the drug-house enhancement is not "automatic any time a home or dwelling under the control of the defendant is implicated in a drug crime . . . ." *United States v. Rodriguez*, 707 F. App'x 224, 227 (5th Cir. 2017). That may be true, but Hagan's home was not merely implicated in his drug conspiracy; it was central to it.

In any event, even had the district court erred in applying the drug-house enhancement— and it did not—the error would have been harmless. The district court explained that it would have "impose[d] the same sentence" even without the enhancement. R. 36, PID 352. "Through this statement, the district court indicated that its sentence would have been the same irrespective of" whether the drug-house enhancement applied, "and its error was thus harmless." *United States*

*v. McCarty*, 628 F.3d 284, 294 (6th Cir. 2010) (citation omitted).  Accordingly, Hagan's objection

to the application of the drug-house enhancement under U.S.S.G. § 2D1.1(b)(12) fails.

###### B.  Leadership Enhancement

The leadership enhancement applies to defendants who organized or led "criminal activity

that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  The

parties agree that there were at least five participants in this drug conspiracy, and the factual record

backs that up.  The parties disagree, however, about whether Hagan acted as the conspiracy's

leader.  To determine if he did, the court must consider whether Hagan "exercised decisionmaking

authority, recruited accomplices, received a larger share of the profits, was instrumental in the

planning phase of the criminal venture, or exercised control or authority over at least one

accomplice."  *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *United States v.

Lalonde,* 509 F.3d 750, 765–66 (6th Cir. 2007)); *see also* U.S.S.G. § 3B1.1, cmt. n.4.

The nature and scope of the drug conspiracy is also relevant.  U.S.S.G. § 3B1.1 cmt. n.4.

The court need not find every factor met for the enhancement to apply.  *See United States v.

Castilla-Lugo*, 699 F.3d 454, 461 (6th Cir. 2012).  The factors help courts assess whether the

defendant "merely play[ed] an essential role in the offense" or actually "*exercise[ed] control* over

other participants, which is what is required to impose an enhancement under § 3B1.1."  *United

States v. Salyers*, 592 F. App'x 483, 486 (6th Cir. 2015) (emphasis added) (quoting *United States

v. Wright*, 747 F.3d 399, 412 (6th Cir. 2014) (internal quotation marks and alterations omitted)).

The district court found that thousands of text messages between Hagan and his customers

showed, by a preponderance of the evidence, that Hagan directed the conspiracy's activities and

exercised control over one or more of its participants.  The record confirms that finding was not

clear error.

This conspiracy, by Hagan's own admission, was entirely his own design. As the conspiracy's "initiator and planner," Hagan held all "decision making authority." *United States v. Barnett*, 643 F. App'x 495, 499–500 (6th Cir. 2016); *see also United States v. Lanham*, 617 F.3d 873, 890 (6th Cir. 2010) (concluding that whether the defendant "originate[d] the conspiracy . . . is significant in assessing" the degree to which he acted as the conspiracy's leader). Only he had connections to the dark web sources of supply and only he determined which drugs to buy, in what quantity, and in what form. Hagan's outsized role in the conspiracy is apparent from his many text messages with customers, in which he bragged about his unique ability to "move 20 grand of product," R. 34, PID 267, informed some distributors how to launder money or buy Bitcoin, advised other distributors what prices to set for their own deals, and explained to others how he manufactured his product.

The evidence also shows how Hagan exercised his decisionmaking authority over the conspiracy's participants. As the conspiracy's only supplier, Hagan set prices for his customers—and those prices were often non-negotiable. R. 34, PID 269 (scolding one of his customers for "trying to haggle/name [his] price" and making clear that the customer had no "bargaining power if you're not buying in bulk, I'm sorry"). But he rewarded loyal customers—and particularly those who dealt for him—with discounted prices. R. 34, PID 244 (referencing his customer's "loyalty discounts"); *id.* PID 250 ("Right now I'm charging random people 9 and people who have been dealing for me for at least a few months 8."). Hagan offered other perks, too. He recruited others to sample his home-manufactured drugs by offering "free stuff" in return. R. 33, PID 216, 238, R. 34, PID 248, 272. To certain customers, however, Hagan made clear demands. He often directed one particular customer—Benjamin Stevenson—to receive drug shipments at his own home, promising a portion of the shipments' contents in exchange. And while Hagan stored large

quantities of drugs in his own apartment, he also arranged for their storage in several other houses around the area. R. 33, PID 221 (telling a customer that he planned to store an extra kilogram of MDMA at "misc houses that aren't mine haha"). Finally, as the conspiracy grew, Hagan began rejecting customers that he considered "regular sized," seeking only those who "plan[ned] on dealing" as well. R. 34, PID 244. In all of these ways, Hagan used his authority to "organiz[e] key features of the conspiracy and direct[] the actions of his coconspirators." *United States v. Sierra-Villegas*, 774 F.3d 1093, 1101 (6th Cir. 2014). In doing so, he established the largest MDMA distribution system in the area. *See* U.S.S.G. § 3B1.1, cmt. n.4 (listing the nature and scope of the activity as relevant factors to the enhancement's application). This evidence supports the district court's application of the leadership enhancement to Hagan's case.

Still, Hagan insists that he was merely an intermediary between his supplier and coconspirators, doing nothing more than providing drugs to customers and letting them decide how to sell them. *See Salyers*, 592 F. App'x at 485 (finding the application of the enhancement unwarranted where the defendant merely "purchased heroin in Cincinnati, travelled back to Kentucky, and distributed it to others," but had no say in "what they did with the drugs after the purchases"). Yet the record clearly shows Hagan did more than just supply the drugs. He alone determined what drugs to purchase and in what quantity, decided where the drugs would be shipped, accepted or rejected potential customers, finished the manufacturing process for certain drugs in his own apartment, and induced others to sample his drugs by offering free drugs in exchange. All this goes to show that Hagan was more than an intermediary between supplier and customer. The district court concluded that he was a leader and organizer of the conspiracy. That conclusion, and thus the application of the leadership enhancement, was not clear error.

## IV.

For all these reasons, we **AFFIRM.**