NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0286n.06

No. 22-3274

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jun 20, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE |
| STEPHANIE RENTAS, | ) ) | NORTHERN DISTRICT OF OHIO |
| Defendant-Appellant. | ) ) | OPINION |
|  | ) | |

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

LARSEN, Circuit Judge. Postal inspectors intercepted two packages of cocaine, one destined for Stephanie Rentas's workplace, another destined for a vacant apartment that she rented. Rentas subsequently pleaded guilty to conspiracy to distribute cocaine and possession with intent to distribute. The district court sentenced her to 48 months' imprisonment, reflecting a downward variance from the Sentencing Guidelines range of 70 to 87 months. Rentas now challenges the procedural reasonableness of her sentence. For the reasons stated, we AFFIRM.

I.

Postal inspectors intercepted two packages from Puerto Rico bound for two different addresses in Cleveland, Ohio. Both packages listed fictitious names as the recipients, but the addresses were real. One address corresponded to Stephanie Rentas's workplace on Waterloo Road (the Waterloo package); the other corresponded to her apartment on Mount Carmel Road (the Mount Carmel package). Based on the point of origin, method of mailing, and the fact that the packages' shipping labels included fraudulent information, postal inspectors suspected that the

packages might contain drugs. The inspectors obtained a search warrant, opened the packages, and discovered approximately 500 grams of cocaine inside each one. The inspectors then conducted a controlled delivery of the Waterloo package to Rentas's workplace. Rentas accepted the package, placed it in the trunk of her vehicle, and took it to her sister's house, where she was living at the time. Postal inspectors followed Rentas to her sister's house, where they discovered a digital scale, a $1,000 money order, ledgers listing drug prices and transactions, and $23,600 in cash. One of the drug ledgers also contained a money order receipt for $1,516 that listed Rentas as the sender and a person in Puerto Rico as the recipient.

A federal grand jury indicted Rentas for conspiracy to distribute 500 or more grams of cocaine and possession with intent to distribute cocaine. Rentas pleaded guilty without a plea agreement. The Presentence Report (PSR) calculated Rentas's base offense level as 30. This offense level was based on the Waterloo and Carmel Road packages as well as twelve additional packages that were included as part of Rentas's relevant conduct. Of these twelve packages, two were addressed to Rentas's work address and ten were addressed to Rentas's vacant apartment on Mount Carmel Road. The Postal Service never seized these twelve packages; instead, it used historical information in its databases to determine that they likely contained drugs given their similarity to the Waterloo and Mount Carmel packages in size, weight, and origin. The PSR also assessed a two-level "drug house" enhancement based on Rentas's use of the empty Mount Carmel apartment as a premises for distributing cocaine. Rentas objected to both the PSR's drug weight calculations and the drug-premises enhancement.

The district court held two sentencing hearings. At the first hearing, Rentas renewed her objections to the PSR's drug-weight calculation. In response, the district court heard from a probation officer as well as postal inspector Michael Adams. The probation officer explained that

the PSR attributed the ten packages addressed to the apartment to Rentas as part of her relevant conduct because they each shared similar features with the Mount Carmel package, such as their point of origin, weight, size, and destination. Adams explained that his investigation confirmed that the two packages sent to Rentas's workplace were similar to the Waterloo package. He also opined that the ten packages sent to Rentas's Mount Carmel apartment belonged to her because his investigation revealed that Rentas rented but did not live in the apartment, and she used the apartment as a "catching point" for drugs. The district court agreed with the probation officer and Adams, explaining that it would "at least make a finding that the total offense level is 30" with a three-level decrease for acceptance of responsibility. Because this offense level was greater than Rentas may have anticipated going into sentencing, the district court adjourned to give Rentas an opportunity to withdraw her plea.

Rentas did not withdraw her plea. At a second sentencing hearing, Rentas instead renewed her objections to the PSR's relevant conduct determination and to the drug-house enhancement. The district court again heard from Adams and the probation officer. Both parties questioned Adams, who reiterated much of what he said during the first sentencing hearing. Similarly, the probation officer reiterated that the ten packages sent to Rentas's Mount Carmel apartment were similar in size, weight, origin, and destination, and therefore could be included as part of her relevant conduct. The court then heard from Rentas. She said that she "h[e]ld [her]self accountable for the two packages that [she] did take" and explained that she rented the Mount Carmel apartment to maintain eligibility for Section 8 housing in that unit but did not want to live there because it was presently too dangerous. Rentas also testified that her ex-boyfriend might have been directing drug packages to that apartment; but, when asked if he was the one responsible for the drug shipments, Rentas declined to blame him.

After hearing from the witnesses, the district court determined that Rentas's total offense level was 27, which, combined with a Criminal History Category of I, corresponded to a Guidelines range of 70 to 87 months in prison. But the court concluded that Rentas's history of working to provide for her children despite troubled personal circumstances counseled leniency. Thus, after considering the factors listed in 18 U.S.C. § 3553(a), the court varied downward, assigning Rentas an offense level of 22.[1] That yielded a Guidelines range of 41 to 51 months, and the court sentenced Rentas to 48 months in prison. This appeal followed.

II.

Rentas challenges the procedural reasonableness of her sentence. For a sentence to be procedurally reasonable, "[t]he court must properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). We review for an "abuse of discretion, keeping in mind that factual findings will stand unless clearly erroneous and legal conclusions will stand unless our fresh review leads to a contrary conclusion." *Id.* (citation omitted).

A.

Rentas first objects to the district court's drug weight calculation. Rentas does not challenge the inclusion of the three packages delivered to her workplace as part of her relevant

---

[1] There was some confusion below as to whether this was a departure or a variance. The parties now agree that it was a variance.

conduct. She contests only the district court's inclusion of the eleven parcels delivered to her Mount Carmel apartment.

The district court's drug quantity calculation is a factual finding that we review for clear error. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). When the quantity of drugs seized "does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n.5. And "[i]f the exact amount of drugs is underdetermined, 'an estimate will suffice, but . . . a preponderance of the evidence must support the estimate.'" *Jeross*, 521 F. 3d at 570 (alteration in original) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)). We will not find clear error where two permissible views of the evidence exist, and the sentencing court's "approximation of drug quantity . . . is supported by competent evidence in the record." *Id.* (citation omitted).

We find no clear error in the district court's decision to include the eleven packages delivered to the apartment as part of Rentas's offense-level calculation. *See id.* Start with the Mount Carmel package delivered to Rentas's apartment. This package was included in the factual basis for her guilty plea. Rentas "h[e]ld [herself] accountable" for this package at the second sentencing hearing. And Rentas's objections to the PSR did not contest her responsibility for the Mount Carmel package. To the contrary, she confirmed that this package belonged to her by acknowledging that the drug "amount involved here was the contents inside Parcel 1 [the Waterloo package] (493.49 grams of cocaine hydrochloride) and the contents inside Parcel 2 [the Mount Carmel package] (501.97 grams of hydrochloride)." She objected only to the inclusion of the other twelve packages sent to her workplace and apartment on the ground that they were "outside the scope of [the] conduct" and did "not meet the preponderance of evidence standard."

The Federal Rules of Criminal Procedure permit sentencing courts to "accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A); *see also United States v. McGee*, 529 F.3d 691, 700 (6th Cir. 2008). Because Rentas did not object to the inclusion of the Mount Carmel package in the PSR, the district court did not err by including this package in Rentas's offense level.

Rentas tries belatedly to escape the PSR's conclusions, suggesting that she had been induced to accept responsibility for the Mount Carmel package by a "tentative, oral, 'two-package deal' with the government" that would have treated these two packages as "the extent of her relevant conduct." But Rentas admits, as she must, that she pleaded guilty *without* any agreement. Her guilty plea made it quite clear that there was "no agreement between the parties about what sentence the[y] will recommend" and that "the Court alone w[ould] decide the advisory guideline range," whether to depart or vary from it, and "what sentence to impose." And just in case there were any "misunderstanding" that might make "the plea somehow involuntary," the district court granted Rentas an adjournment and "the opportunity to withdraw her guilty plea." Rentas declined. And she does not contest the validity of her plea here; nor does she claim that the government breached any plea agreement. So we see no reason not to hold Rentas to the clear rule set out in Federal Rule of Criminal Procedure 32(i)(3): criminal defendants who disagree with any portion of a PSR must specifically object or risk that portion being accepted as a finding of fact. *See McGee*, 529 F.3d at 700. The district court did not err by including the Mount Carmel package in Rentas's drug weight calculation.

We turn now to the other ten packages delivered to Rentas's Mount Carmel apartment that the district court included as part of her relevant conduct. Again, we find no clear error. Relevant conduct includes "all acts and omissions committed, aided, [or] abetted . . . by the

defendant . . . that occurred during the commission of the offense of conviction."   U.S.S.G. § 1B1.3(a)(1)(A)–(B).   For offenses that can be grouped together under § 3D1.2(d), like drug trafficking, relevant conduct includes all acts that are "part of the same course of conduct or common scheme or plan as the offense of conviction."   *Id.* § 1B1.3(a)(2).   Moreover, two or more offenses constitute a common scheme or plan when they are "substantially connected to each other by at least one common factor" such as common purpose or similar modus operandi.   *Id.* § 1B1.3 cmt. n.5(B)(i).

Competent evidence in the record shows that the ten other packages delivered to the Mount Carmel apartment share several features in common with the Mount Carmel package.   For example, Adams and the probation officer explained at the second sentencing hearing that, like the Mount Carmel package, the ten packages were from Puerto Rico, were addressed to Rentas's Mount Carmel apartment, and were similar to the Mount Carmel package and to one another in size and approximate weight.   Rentas concedes that she leased the Carmel Road Apartment, further linking her to the packages delivered to that address.   For these reasons, the district court had "competent evidence" to support including these packages in Rentas's relevant conduct.   *See Jeross*, 521 F.3d at 570.

Rentas has two main rejoinders.   First, she argues that these ten packages cannot be attributed to her under a "common-scheme-or-plan" theory because, even if the packages were similar in size, weight, and origin, some were shipped via Priority Mail whereas all of the Waterloo packages (for which she takes responsibility) were shipped via Priority Mail Express.   The primary difference between Priority Mail Express and Priority Mail is that packages shipped via Priority Mail Express are guaranteed to arrive sooner than packages shipped by Priority Mail.   *Compare* PRIORITY MAIL, https://www.usps.com/ship/priority-mail.htm#3 (last visited May 21,

2023) (delivery time is 1–3 business days), *with* Priority Mail Express, https://www.usps.com/ship/priority-mail-express.htm (last visited May 21, 2023) (delivery time is 1–2 days guaranteed). The difference in shipping time between these two methods is small, however, and the shipping methods share some similarities too—both are run by the Post Office, involve flat rate shipping, and include online tracking. *See id.* More importantly, the "common scheme or plan" for purposes of the relevant conduct inquiry requires only that the relevant conduct share one common factor with the "offense of conviction." S*ee* U.S.S.G. § 1B1.3 cmt. n.5(B)(i). Here, there are several common factors besides the shipping service (USPS)—a Puerto Rican point of origin, a destination associated with Rentas, and the size and weight of the packages—so any minor difference between shipping types is unpersuasive. Rentas's first rejoinder fails.

Rentas also asserts that any similarity in the size and weight across packages is an artifact of the shipping constraints associated with the Priority Mail and Priority Mail Express shipping services. This argument also fails. Under either shipping method, senders can select from a variety of boxes in which to ship their materials. *See, e.g*., PRIORITY MAIL, https://www.usps.com/ship/priority-mail.htm (last visited May 21, 2023) (listing nearly a half-a-dozen shipping methods to choose from). So the similarity in size, shape, and weight among the ten packages sent to Rentas's Mount Carmel apartment is not merely a function of USPS restrictions, but rather reflects a deliberate choice by the sender in Puerto Rico who could have chosen between several different box sizes. The district court did not procedurally err when calculating the drug weight.

B.

Next, Rentas challenges the district court's two-level enhancement for Rentas's use of the Mount Carmel apartment as a drug premises. The Guidelines direct sentencing courts to apply the

two-level drug-house enhancement if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The drug-house enhancement applies to anyone "who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." *Id.* § 2D1.1 cmt. n.17; *see also United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). Renting a premises is evidence that a defendant "maintained" it, *see* U.S.S.G. § 2D1.1 cmt. n.17, and a "premises" includes any "place" used to "distribut[e] a controlled substance," s*ee Johnson*, 737 F.3d at 447. "At bottom, the question is whether [Rentas's apartment] 'played a significant part' in distributing drugs." *United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014) (quoting *Johnson*, 737 F.3d at 449).

Rentas admits that she rented the apartment and does not dispute her control over it; that shows that she "maintained" it. *See* U.S.S.G. § 2D1.1 cmt. n.17; *Johnson*, 737 F.3d at 447. And, as explained above, it was not clear error for the district court to determine that eleven packages of cocaine had been delivered to Rentas's apartment. Thus, the apartment "'played a significant part' in distributing drugs." *See Bell*, 766 F.3d at 637 (quoting *Johnson*, 737 F.3d at 449). Finally, the district court could reasonably conclude that distributing drugs was at least "*one of* [the] primary or principal uses for" the apartment. *Johnson*, 737 F.3d at 447 (quoting U.S.S.G. § 2D1.1 cmt. n.17). Rentas continued paying for the vacant apartment even though she did not live there. And even if she also wished to keep the apartment to maintain future eligibility for Section 8 housing, the enhancement may apply even if distributing drugs "is not 'the sole purpose for which the premises was maintained.'" *Johnson*, 737 F.3d at 447 (quoting U.S.S.G. § 2D1.1 cmt. n.17). So the drug-house enhancement was proper.

Rentas counters that the drug-house enhancement cannot apply to her because, as a textual matter, this enhancement does not apply to apartments that are used only as a "delivery address" for drug shipments. In Rentas's view, the drug-house enhancement would apply only if the government had proven that the packages entered the apartment. In this way, Rentas attempts to cast her apartment not as a physical location with "metes and bounds," but rather as nothing more than a "routing symbol in a postal database" that someone used when shipping drugs from Puerto Rico to Cleveland. That argument fails. Rentas's apartment was not just a "routing symbol"; rather, it played a "significant part" in distributing drugs by serving as a physical location to which suppliers in Puerto Rico shipped at least eleven packages of cocaine. *See Bell*, 766 F.3d at 637. Given that the drug-smuggling scheme could only work if the shippers had a real, physical destination for the drugs, the Mount Carmel apartment was integral to the success of the operation. Thus, Rentas "maintained . . . a premises . . . for the purpose of distributing" cocaine, so the drug-house enhancement applies to her conduct. *See* U.S.S.G. § 2D1.1(b)(12); *Johnson*, 737 F.3d at 447.

\* \* \*

We AFFIRM.