NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0216n.06

No. 23-5588

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 14, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | TENNESSEE |
| JA'QUON LATRELL ROBERSON, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: BUSH, NALBANDIAN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Ja'quon Roberson pleaded guilty to unlawfully possessing a firearm. When determining his sentence, however, the district court did not use the sentencing guideline that covers the illegal possession of firearms. It instead turned to the guideline for the illegal trafficking of drugs. The court reasoned that Roberson had possessed the firearm while selling large quantities of marijuana. It then enhanced Roberson's sentence because he had, among other things, threatened the police and operated a drug house. Roberson now argues that the district court should not have invoked the drug-offense guideline or imposed these two enhancements. But both the law and the facts supported all these sentencing decisions. We thus affirm.

I

In 2020, federal and state investigators uncovered a substantial drug-trafficking operation in western Tennessee. The police learned of this operation after obtaining a search warrant for the

Snapchat account of a drug dealer in the State of Washington. This drug dealer's Snapchat conversations revealed that he regularly shipped large quantities of marijuana to an accomplice in Tennessee. The Tennessee accomplice's conversations, in turn, implicated Roberson in the drug-trafficking ring.

That September, the police asked a confidential informant to buy drugs from Roberson through his Snapchat account. Roberson directed the informant to his home on College Street in Dyersburg, Tennessee. The informant bought about 112 grams of marijuana inside Roberson's home.

Two days later, officers executed a search warrant at this location. They found a half-ounce of marijuana, ammunition, and two handguns, one of which was a Taurus pistol. Although the officers uncovered little marijuana, they seized a lot of "packaging material," including vacuum-seal bags that could each hold a pound of marijuana and several five-gallon buckets lined with carbon paper. McDowell Tr., R.544, PageID 1851. The officers recovered many similar bags and buckets, including some filled with marijuana, at other locations while investigating the broader drug-trafficking operation. Days after the search of his home, Roberson posted a video on his Snapchat account implying that the police had missed the "bulk of his marijuana" and showing a backpack hanging in the nearby trees. *Id.*, PageID 1852.

Roberson continued to sell marijuana over the next eight months. The police eventually learned that he had moved to a new Dyersburg address on Hamer Road. They obtained a warrant to search this location in May 2021. At the Hamer Road home, officers found two firearms, ammunition, hundreds of vacuum-seal bags, and additional five-gallon buckets. This time, they also discovered over 20 pounds of marijuana in vacuum-sealed bags in the woods 150 feet away from the home.

The government charged Roberson and several codefendants with many drug and firearm offenses. Roberson entered a plea deal. In exchange for the dismissal of all other charges, he agreed to plead guilty to illegally possessing the Taurus pistol found at his College Street home while he was an unlawful user of a controlled substance. *See* 18 U.S.C. § 922(g)(3). As part of the plea, Roberson admitted to helping distribute 374 pounds of marijuana.

At sentencing, the district court calculated Roberson's guidelines range as 97 to 120 months' imprisonment. The court opted to vary downward from this range by imposing a 90-month sentence.

## II

A district court imposes a procedurally unreasonable sentence if it miscalculates a defendant's guidelines range. *See United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019). On appeal, Roberson argues that the district court miscalculated his guidelines range in three different ways. We will consider his three challenges in turn.

### A. Cross-Reference to Drug Guideline

Even though Roberson pleaded guilty to a firearm offense, the district court relied on the guideline for drug crimes (not firearm crimes) to calculate his guidelines range. Roberson first challenges the court's use of this drug-offense guideline.

His challenge requires an understanding of the basic legal framework. That framework begins with a "cross-reference" provision in the guideline for firearm offenses, U.S.S.G. § 2K2.1. That cross-reference tells a district court to use a different guideline to calculate a defendant's guidelines range if the defendant possessed the charged firearm "in connection with" another offense and if the use of this other guideline produces a greater offense level:

> If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense . . . , apply—(A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above[.]

*Id.* § 2K2.1(c)(1). The referenced provision—§ 2X1.1—directs the district court to the specific guideline that applies to the other "substantive offense" that the defendant committed (drug trafficking in Roberson's case). *Id.* § 2X1.1(a); *see id.* § 2D1.1. Section 2X1.1 also instructs the district court to start with this other guideline's "base offense level" and to make any "adjustments" to that base offense level that the guideline calls for. *Id.* § 2X1.1(a).

To invoke § 2K2.1(c)(1)'s cross-reference, the government must prove at least two facts under a preponderance-of-the-evidence standard. *See United States v. Scheiblich*, 788 F. App'x 305, 308 (6th Cir. 2019); *United States v. Hill*, 973 F.2d 459, 461 (6th Cir. 1992). The defendant first must have engaged in the "commission or attempted commission of another offense[.]" U.S.S.G. § 2K2.1(c)(1). The defendant next must have "used or possessed" a specific firearm (the one "cited in the offense of conviction") "in connection with" that other offense. *Id.* The cross-reference's focus on the *charged* firearm "in the offense of conviction" distinguishes it from a nearby enhancement in § 2K2.1 that applies if the defendant used *any* firearm "in connection with" another felony offense. *Compare id.* § 2K2.1(b)(6)(B), *with id.* § 2K2.1(c)(1).

What do the cross-reference (§ 2K2.1(c)(1)) and similar enhancement (§ 2K2.1(b)(6)(B)) mean by the amorphous phrase "in connection with"? *Cf. Mont v. United States*, 139 S. Ct. 1826, 1832 (2019). Section 2K2.1's commentary (which both parties accept as valid) provides guidance about this phrase's meaning when, as in this case, the government alleges a "drug trafficking offense" as the other crime. U.S.S.G. § 2K2.1 cmt. n.14(B)(ii). The commentary suggests that the required relationship exists if the gun was "found in close proximity to drugs, drug-

manufacturing materials, or drug paraphernalia." *Id.* In those circumstances, the commentary indicates, "the presence of the firearm has the potential of facilitating" the drug offense. *Id.* § 2K2.1 cmt. n.14(B); *see United States v. Seymour*, 739 F.3d 923, 930 (6th Cir. 2014). This logic incorporates a version of our longstanding "fortress theory." *See United States v. Shanklin*, 924 F.3d 905, 919–20 (6th Cir. 2019). Under that theory, if the police find a gun at a house where defendants store or distribute drugs, courts may conclude that they possessed the gun to protect their drugs and drug proceeds from robbery. *See, e.g.*, *id.*; *United States v. Coleman*, 627 F.3d 205, 212–14 (6th Cir. 2010); *United States v. Angel*, 576 F.3d 318, 320–23 (6th Cir. 2009); *United States v. Burns*, 498 F.3d 578, 580–81 (6th Cir. 2007); *United States v. Ennenga*, 263 F.3d 499, 503–04 (6th Cir. 2001); *Hill*, 973 F.2d at 462; *see also United States v. Crump*, 65 F.4th 287, 300 (6th Cir. 2023).

The district court found the cross-reference's elements met in Roberson's case. Roberson admitted to possessing the charged firearm: the Taurus pistol found at his College Street home. He also admitted to distributing hundreds of pounds of marijuana. But he argued that he did not do the first "in connection with" the second. U.S.S.G. § 2K2.1(c)(1). The district court disagreed. It found the required connection based on an officer's "testimony" at sentencing and the "videos" from Roberson's Snapchat account. Sent. Tr., R.544, PageID 1947.

We review the court's legal rulings de novo and its factual findings for clear error. *See United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). But Roberson does not dispute any of those rulings or findings. Rather, he challenges only the court's ultimate conclusion that the required connection existed. Our review of this type of "mixed" question of law and fact can depend on the specific guideline question before us. *See id.* at 608–09. For the mixed question here, we have long used a forgiving standard of review that gives "due deference" to a district

court's conclusion that a defendant possessed a firearm in connection with another offense. *See United States v. Taylor*, 648 F.3d 417, 430–32 (6th Cir. 2011); *Ennenga*, 263 F.3d at 502.

This deferential standard dooms Roberson's challenge. The district court reasonably found that he possessed the Taurus pistol "in connection with" his drug trafficking. U.S.S.G. § 2K2.1(c)(1). To begin with, he kept this gun in "close proximity to" marijuana and marijuana "paraphernalia." *Id.* § 2K2.1 cmt. n.14(B)(ii). The officers discovered the loaded pistol "on the main floor" of the College Street home. McDowell Tr., R.544, PageID 1850; *cf. Taylor*, 648 F.3d at 433. And plenty of evidence revealed that Roberson used this home to sell and store marijuana. In the months before the search, he posted a video on Snapchat showing "a large and valuable stash of" marijuana near black buckets at the home. *Ennenga*, 263 F.3d at 504. Just days before the search, a confidential informant conducted a "controlled buy" of marijuana there. *Burns*, 498 F.3d at 580. During that search, the officers found the Taurus, a small amount of marijuana, and the buckets and bags that Roberson and his coconspirators generally used to ship and store marijuana. Lastly, Roberson suggested on Snapchat soon after this search that the police had missed his marijuana cache only because he had hidden it in nearby trees. *Cf. Taylor*, 648 F.3d at 432–33.

More generally, Roberson used firearms to "protect himself and his illegal drugs" and to "serve[] notice to potential buyers" not to rob him. *Coleman*, 627 F.3d at 212. Roberson himself made this point in a police interview right after the search. While pointing to bullet holes in the walls from an earlier shooting, he told the police that he kept firearms at the house because of individuals who "wished to do him harm." McDowell Tr., R.544, PageID 1858. These statements tracked his social media. A few weeks before the search, Roberson posted a Snapchat video in which he told viewers that they were not "brave enough" while he aimed a firearm at bullet holes

in the wall of his College Street residence. *Id.*, PageID 1859. An officer opined that Roberson had posted this video "as a warning or deterrent to others not to try to rob [him] of [his] drug proceeds." *Id.*, PageID 1860. Another photo also showed currency and a firearm at the home. Roberson included the following message with this picture: "Ima trap this bitch out until the feds come!! Or you 'gangstas.'" Ex. 3, R.583-1, PageID 2252. The same officer testified that traffickers commonly use "trap" to refer to the "drug trade" or the "location" at which they sell drugs and that "gangsta" referred to "other individuals on the street" who "would want to come rob [Roberson] of his items." McDowell Tr., R.544, PageID 1847. Roberson's own statements thus confirmed the conclusion that he used the Taurus pistol to protect his drug business.

B. Threat-of-Violence Enhancement

Roberson next challenges the district court's decision to enhance his base-offense level because he threatened two police officers. In 2010, Congress ordered the Sentencing Commission to adopt a guideline enhancement that would cover a defendant who used, ordered, or threatened violence during a drug-trafficking crime. *See* Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 5, 124 Stat. 2372, 2373. As a result, the drug-trafficking guideline now instructs district courts to increase a defendant's offense level by two "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence[.]" U.S.S.G. § 2D1.1(b)(2).

This case addresses the middle part of this enhancement: what does it mean for a defendant to have "made a credible threat to use violence"? *Id.* Although we have little caselaw interpreting this phrase, its meaning is clear enough. *Cf. United States v. Pineda-Duarte*, 933 F.3d 519, 522 (6th Cir. 2019). The word "threat" commonly means "[a] communicated intent to inflict harm or loss on another." *Black's Law Dictionary* 1618 (9th ed. 2009); *see United States v. Jeffries*, 692 F.3d 473, 483–84 (6th Cir. 2012) (Sutton, J., dubitante) (citing definitions). And the guideline

7

adds that the "threat" must be "credible." U.S.S.G. § 2D1.1(b)(2). So the speaker's communicated intent to use violence must be "[c]apable of being believed" by those who hear it. *American Heritage Dictionary of the English Language* 427 (5th ed. 2011). Put another way, the communication must qualify as what the Supreme Court has called a "true threat" in the First Amendment context. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). The guideline thus excludes "hyperbole," sarcasm, or similar statements that, when read in context, could not be reasonably read as communicating a realistic "possibility that violence will follow[.]" *Id.*

The district court concluded that Roberson made credible "threats" against two of the officers who searched his Hamer Road home in May 2021. Sent. Tr., R.544, PageID 1941. It relied on the "photographs" and "videos" that Roberson posted to social media after this search. *Id.*, PageID 1941–42, 1949–51. In these posts, Roberson showed pictures of the officers and their family members or significant others. In one of them, he also stated: "Ima tryna get them niggas gone , FUCK ANOTHER CASE... I'm sparky son . . . 30-50k[.]" Ex. 9, R.583-1, PageID 2272. The post included emojis showing "fire and a muzzle blast." McDowell Tr., R.544, PageID 1898. Law enforcement read this statement as "offering 30 to $50,000 for a hit on" the two officers. *Id.*, PageID 1899. Another Snapchat post showed a screenshot of Roberson's Facebook messages to one of the officers ordering this officer to "stop stalking" his mother. Ex. 9, R.583-1, PageID 2275. In the Snapchat post, Roberson included a text overlay with blood emojis and the text: "I'll go do life behind my mama on TAYE AND MY DADDY GRAVE[.]" *Id.* In still another video, Roberson scrolled through photos of one of the officers while stating that this officer "ain't worth it, but I want him gone." McDowell Tr., R.544, PageID 1896–97, 1942. And in yet another one, Roberson pointed a firearm at a police cruiser and threatened to kill the officer inside. *Id.*, PageID

1900. The court found that a "reasonable person" would interpret these social-media posts collectively as threats to harm the two officers. *Id.*, PageID 1941–42.

What standard of review should apply to this conclusion that Roberson's social-media posts rose to the level of a "credible threat to use violence"? U.S.S.G. § 2D1.1(b)(2). Other courts appear to review this mixed question under a deferential clear-error standard. *See United States v. Dennis*, 41 F.4th 732, 744 (5th Cir. 2022); *United States v. Guzman*, 926 F.3d 991, 1002 (8th Cir. 2019); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 82–83 (2d Cir. 2018). But we need not resolve this (unbriefed) issue. Roberson's statements would qualify even under de novo review.

Those statements objectively conveyed a "communicated intent" to harm the officers rather than (as Roberson claims) mere "bluster." *Black's Law Dictionary*, *supra*, at 1618; Appellant's Br. 12. Nothing about the context of Roberson's posts would have led a reasonable person to treat them as hyperbole. *See Counterman*, 600 U.S. at 74. To the contrary, Roberson targeted two specific officers who had helped subject him to prosecution. He then proclaimed that he wanted these officers "gone" and would pay significant sums for their murders. Ex. 9, R.583-1, PageID 2272. His many other social-media posts—which showed his ready access to guns and money— also suggested that he had the means to carry out this desire.

In response, Roberson relies on caselaw about a separate obstruction-of-justice guideline. *See United States v. Turner*, 738 F. App'x 856, 862–64 (6th Cir. 2018); *United States v. Archer*, 671 F.3d 149, 166–68 (2d Cir. 2011). This guideline requires a defendant who makes a threat to have "attempted to obstruct or impede" the proceedings. U.S.S.G. § 3C1.1. And the courts in these two cases found that the defendant's statements fell short of this mark. *See Turner*, 738 F. App'x at 862; *Archer*, 671 F.3d at 167. But their conclusions do Roberson no good here. Section 2D1.1(b)(2) contains no similar intent-to-influence-the-proceedings element.

We end with a (significant) disclaimer. To prosecute a defendant for making threatening statements, the Supreme Court has held that the First Amendment requires the government to prove that the "defendant had some subjective understanding of the threatening nature of his statements." *Counterman*, 600 U.S. at 69. Specifically, defendants must at least act *recklessly*—meaning that they must know "'that others could regard [their] statements as' threatening violence[.]" *Id.* at 79 (citation omitted). In addition, the Court has interpreted a federal "threats" statute as containing an implicit (but undefined) "mental state" element. *Elonis v. United States*, 575 U.S. 723, 737 (2015). When doing so, the Court rejected the claim that the government need only prove that a "reasonable person" would interpret a statement as threatening. *Id.* at 737–38. Here, the district court did suggest that Roberson "*intended*" for his statements "to be a threat against law enforcement." Sent. Tr., R.544, PageID 1951 (emphasis added). Otherwise, though, the district court never expressly indicated that it needed to find anything more than that a "reasonable person" would find Roberson's statements threatening. *Id.*, PageID 1950–51. In other words, it is not clear that the court decided what (if any) state-of-mind element this threat enhancement contains. We need not consider this issue either. Roberson made no state-of-mind arguments on appeal, so we can save this issue for another case. He instead argued only that his statements did not objectively convey an intent to harm. On that score, he is mistaken.

### C. Drug-Premises Enhancement

Roberson lastly challenges the district court's decision to increase his offense level because he distributed drugs from his homes. When Congress told the Sentencing Commission to add the threat-of-violence enhancement, it separately instructed the Commission to increase a defendant's offense level if "the defendant maintained an establishment for" drug distribution. Fair Sentencing Act, § 6(2), 124 Stat. at 2373; *see United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014). So the

Commission adopted another enhancement that directs district courts to increase a defendant's offense level by two "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance[.]" U.S.S.G. § 2D1.1(b)(12).

The Commission's commentary clarifies what this enhancement requires. A defendant must have "maintained" a premises—that is, had a "possessory interest in" or de facto "control[]" over it. *Id.* § 2D1.1 cmt. n.17. Next, the defendant must have engaged in drug-trafficking activities (such as the manufacture, distribution, or storage of drugs) as "one of the . . . primary or principal uses for the premises[.]" *Id.*; *United States v. Heard*, 2024 WL 1049480, at *4–5 (6th Cir. Mar. 11, 2024); *United States v. Johnson*, 737 F.3d 444, 447–49 (6th Cir. 2013).

The district court found that Roberson "maintained" his College Street and Hamer Road homes for "distributing" marijuana. U.S.S.G. § 2D1.1(b)(12). Given that Roberson lived at both places, he did not dispute that he "maintained" them. *Cf. Johnson*, 737 F.3d at 447. But he claimed that he did not do so to facilitate his marijuana distribution. The district court disagreed based on the social-media "videos" and "photographs" showing Roberson keeping marijuana, guns, and firearms at his homes. Sent. Tr., R.544, PageID 1952. We have yet to decide whether we should review this conclusion (that drug distribution was a location's "principal purpose") de novo or deferentially. *See Heard*, 2024 WL 1049480, at *4–5; *Bell*, 766 F.3d at 636; *see also United States v. Terry*, 83 F.4th 1039, 1040–41 (6th Cir. 2023). Ultimately, though, this issue does not matter here. Roberson "loses either way"—at least with respect to his College Street home. *Bell*, 766 F.3d at 636.

The evidence will "usually suffice" to establish that a defendant used a home for the "principal purpose[]" of drug trafficking if it shows that the defendant stored and distributed drugs there. *Id.* at 638; *see Terry*, 83 F.4th at 1044; *United States v. Leggett*, 800 F. App'x 378, 381 (6th

Cir. 2020). Roberson did both at his College Street home. As for distribution, the confidential informant's controlled buy offers a concrete example. And Roberson posted a photograph of this home on social media with a caption stating his plan to "trap this bitch out[.]" McDowell Tr., R.544, PageID 1847. As noted, he thereby expressed his desire to engage in the drug trade from the home. As for storage, Roberson's social media also showed that he kept "large quantities of" marijuana at the residence. *Johnson*, 737 F.3d at 447. And the police found "storage container[s]" (the five-gallon buckets) that matched the containers that Roberson and his coconspirators used to ship marijuana. *Leggett*, 800 F. App'x at 381. Lastly, Roberson's social media also contained pictures of the College Street home with the "tools of the [drug] trade," including "guns" and "large quantities of cash[.]" *Johnson*, 737 F.3d at 447 (citation omitted). By all accounts, Roberson ran his marijuana business out of his home.

We affirm.